# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 16-cv-63040-BLOOM/Valle

RALPH L. SANDERS

      Plaintiff,

v.

TEMENOS USA, INC.,

      Defendant.

_____/

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant Temenos USA, Inc.'s ("Defendant" or "Temenos") Motion for Summary Judgment, ECF No. [90] (the "Motion"). The Court has reviewed the Motion, all opposing and supporting submissions, the record and the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is granted.

## I. BACKGROUND

### A. Sanders' Employment

Temenos provides software solutions to banks and other financial institutions. Defendant's Statement of Undisputed Material Facts, ECF No. [91] ("Def. SOF") at ¶ 1.[1] Sanders began working for Temenos as a permanent employee in a technical consultant position in June of 2001. *Id.* at ¶ 25; ECF No. [105] at 4. Sanders became a senior technical consultant

---

[1] Local Rule 56.1(b) provides in relevant part that "[a]ll material facts set forth in the movant's statement filed and supported . . . will be deemed admitted unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." *See* S.D. Fla. L.R. 56.1(b). The Court notes that Sanders' Response to the Motion, ECF No. [105], purports to directly dispute only a small number of the facts presented in Temenos's Statement of Undisputed Material Facts. To the extent that record evidence supports the otherwise uncontroverted facts presented by Temenos, those facts are deemed admitted.

some time in 2010, a position he retained until his employment was terminated in August of 2013.  *See* Def. SOF at ¶¶ 3, 33.

Some issues concerning Sanders' employment began to arise in late 2012.  For example, on January 9, 2013, a Temenos project manager emailed Sanders' manager, Dallan McManus, regarding what appears to have been a business trip abroad, stating that he had "been trying to contact [Sanders] urgently since . . . he neglected to hand in his []issued laptop before he left Trinidad" and that Sanders was not "responding to [his] mail or Skype and [he] just wanted to ask . . . [about] his whereabouts."   *Id.* at ¶ 9 (citing ECF No. [92-3]).  As a result, McManus emailed Sanders on January 11, 2013, stating to him that he did not understand why Sanders brought the equipment back to the United States.  *Id.* at ¶ 10 (citing ECF No. [92-3]).  Sanders did not return the laptop until March 13, 2013.  *Id.* at ¶ 11.

On May 1, 2013, McManus evaluated Sanders in a telephone conversation, bringing to Sanders' attention several issues of concern.  *Id.* at ¶¶ 15-16.  The issues raised by McManus included the following: a client of Temenos had requested that Sanders be removed from a project in favor of a less experienced employee; project difficulties had arisen on a number of occasions as a result of Sanders getting involved with areas that he had no expertise in; Sanders' emails were sometimes difficult to understand; McManus had experienced "personal embarrassment" stemming from a situation relating to Sanders and a project in Saudi Arabia;[2] and apparent tension between Sanders and other employees he had been working with.  *See id.* at ¶ 16.

On June 10, 2013, McManus asked Sanders to provide him a status update on a project that he had been working on.  *Id.* at ¶ 18.  Sanders was absent from work that day for jury duty,

---

[2] According to Sanders' Second Amended Complaint, ECF No. [85], Sanders was asked to travel to Saudi Arabia on a business visa in December of 2012, but Sanders declined the request due to safety concerns he had and his belief that a business visa was not the proper visa for such a trip.  *See id.* at ¶¶ 31-35.

of which Sanders failed to inform Temenos. *Id.* at ¶ 17. McManus had to ask Sanders for the status update again on June 14, 2013. *Id.* at ¶ 19. On June 17, 2013, McManus, still having not received the status update from Sanders, emailed Sanders the following message: "I should not have to continuously chase you for this information I see this as insubordination." *Id.* at ¶ 20 (citing ECF No. [94-4]). Sanders responded the same day by "resending" the status update and stating that he had received a delivery failure message on June 14, 2013, when he first attempted to send the status update. *Id.* at ¶ 21; ECF No. [94-4].

### B. The Events Leading up to Sanders' Termination

On August 12, 2013, a program manager, Jesse Morales, emailed Sanders stating that he "would like [Sanders] to be in Lake Mary" in Orlando, Florida for a "worksession" taking place from August 21, 2013 through August 23, 2013. Def. SOF at ¶ 22 (citing ECF No. [92-10]). In response, Sanders emailed Morales on August 14, 2013, in which he indicated that he had a "conflict with Thursday [August 22, 2013]" because of a "court hearing" and also asked "how far is the office from where everyone is staying[,]" citing a newly developed "slight issue with walking." ECF No. [92-10]. After the program manager informed Sanders that "[t]he office is about 4 to 5 blocks from the hotel" and that "the hotel has a shuttle bus that will bring you to the office[,]" Sanders replied in an email on August 20, 2013, stating that he was "down to a cane now along with 7 meds" and that he "will use the shuttle bus." *Id.* However, Sanders never showed up for the August 21-23 worksession. Def. SOF at ¶ 26. According to Sanders, his wife had called beforehand to inform Temenos that Sanders could not walk, although Sanders "couldn't say" whether anyone told McManus about his wife's call. *Id.* at ¶ 28 (citing ECF No. [92-1] at 57).

Shortly thereafter, on the evening of August 25, 2013, Sanders emailed Morales and McManus, stating: "I had mentioned I had a medical issue, doctors put me on different meds that the mix created an issue. . . . Most of the [] meds [the doctors now currently have me on] have the wording 'May cause drowsiness' is an understatement [sic]." ECF No. [92-8]. McManus replied the same evening, stating: "As communicated previously please communicate with HR and me your line manager when you are ill. You were expected in Orlando last week and did not show and nobody could get a hold of you. Please confirm we can meet in Miami office next Thursday I will send a [sic] invite for a meeting." *Id.*

During a conference call that took place on August 28, 2013, McManus terminated Sanders' employment with Temenos. *See* Def. SOF at ¶ 33. McManus stated to Sanders: "I regret to inform you that we no longer have a position for you with Temenos, at this moment in time, and so we are going to terminate your employment effective immediately." *Id.* (citing ECF No. [94-1]). McManus claims that he "made the decision to terminate [Sanders'] employment because [Sanders] was expected in Orlando during the week of August 19, 2013, but he did not show and nobody could reach him; and because of his failure to meet deadlines, tardiness, and behavior." ECF No. [94-1]. Also, McManus maintains that he made that decision "prior to receiving [the] August 25, 2013 email from Mr. Sanders about his medications." *Id.*

### C. Sanders' Conversation with Human Resources on August 26, 2013

At the time of his termination, Sanders was suffering from clinical major depression and gout. *See* Def. SOF at ¶ 43. During a telephone call Sanders had with Nidia Rivera of Temenos's Human Resources department on August 26, 2013—two days before he was terminated—Sanders alluded to certain health-related issues of his, along with other issues such as foreclosure and domestic-related matters he was involved in at the time. *See generally* ECF

No. [92-9] (transcript of the conversation between Sanders and Rivera).[3]  Sanders went into detail about the complications certain legal matters were creating for him, and in doing so he referenced "medications they've got me on"—such as blood pressure medication that created problems for him with walking, "anti-inflammatory and pain medication[,]" and "anxiety and anti-depression" medication.  *Id.* at 3-4.  When asked by Rivera if he was working, Sanders responded: "Yeah, I am. [] I'm working, but not as productive as I should be. Not as responsible as I should be. . . ."  *Id.* at 6.  Regarding his medications, Sanders later inquired whether Rivera would "need any documentation" from his doctors, to which Rivera responded: "The medication, but if that's affecting your job, then you need to, you know, to talk to the doctor about alternatives."  *Id.* at 7.  Sanders then stated that he would "talk to the doctor, see if there's something else different [] to get me over this little hump until after October."  *Id.* at 7-8.  Finally, Rivera advised Sanders that she needed to know what Sanders' employment status was, stating to him that "if you're on your medication and doctors find that you're disabled, I need to know that."  *Id.* at 8.  Sanders responded that he understood.  *Id.*  Although Rivera referenced in passing a potential "need [for] family leave" near the end of the conversation, Sanders never addressed the topic.  *See id.* at 8-9.

### D.  Sanders' Insurance Coverage and his Wife's Health Condition

Sanders, his wife, Virpi Sanders, and their two daughters, were all covered under Temenos's medical insurance during Sanders' employment with Temenos.  Def. SOF at ¶ 46. After Sanders was terminated on August 28, 2013, Temenos provided Sanders with free health insurance until July 1, 2014.  *Id.* at ¶ 47.  In March of 2011, Mrs. Sanders—whom Sanders was married to since 2007—became ill with cancer, and she suffered from that cancer for much of

---

[3] Sanders testified at his deposition that he recorded his conversation with Rivera, and that the recording was later transcribed.  *See* ECF No. [92-1] at 13, 43.

2011 through 2014. *See* ECF No. [85] at ¶ 16; Def. SOF at ¶ 48. Mrs. Sanders passed away in Finland on October 14, 2014. Def. SOF at ¶ 48. Mrs. Sanders had traveled to Finland in July of 2014 upon expiration of the free health insurance coverage provided by Temenos—a trip which, according to Sanders, was for the purpose of seeking further medical treatment for her cancer. *See* ECF No. [85] at ¶ 133. For the first month Mrs. Sanders was in Finland (July of 2014), she was covered by travel insurance, the total cost of which Sanders does not remember. *See* ECF No. [92-1] at 51, 259. Mrs. Sanders had free health coverage in Finland "[f]or the second and final months." *Id.* at 259.

At the time of Sanders' termination, he and his family were on UnitedHealthcare's 7DF-P health insurance plan (the "7DF-P plan"). Def. SOF at ¶ 56. In 2014, Sanders and his family would have been eligible for UnitedHealthcare's UHC's OKD health insurance plan (the "OKD plan"). *Id.* at ¶ 58 (citing ECF No. [93-1]). If Sanders had elected "COBRA coverage"[4] after his termination, he would have been required to pay $1,924.81 per month for the 7DF-P plan and $2,061.07 per month for the 0KD plan. *Id.* at ¶¶ 57, 59 (citing ECF No. [93-1]). Initially, Sanders claimed that he accumulated $4,000 in uncovered medical expenses since the date of his termination. *See id.* at ¶ 54. At his deposition, Sanders testified that he "figure[s]" the amount is actually higher than $4,000, ECF No. [92-1] at 66-67, although he did not provide any documentation to substantiate that assessment.

### E. The Instant Lawsuit

Sanders, proceeding *pro se*, initially filed suit against Temenos in the Southern District of New York on September 3, 2015. *See* ECF No. [1]. On December 22, 2016, the case was

---

[4] The Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA") amended the Employee Retirement Income Security Act ("ERISA") by requiring that covered group health plans "provide . . . that each qualified beneficiary who would lose coverage . . . as a result of a qualifying event [(such as termination of employment)] is entitled . . . to elect . . . continuation coverage under the plan." 29 U.S.C. § 1161(a); *see also* 29 U.S.C. § 1163(2).

transferred to the Southern District of Florida. *See* ECF Nos. [36], [37]. Shortly thereafter, Sanders retained counsel and filed an Amended Complaint. *See* ECF Nos. [43], [51]. In the Amended Complaint, Sanders asserted the following claims: (1) interference and retaliation under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 (Counts I and II); retaliation under the Florida Whistleblower's Act ("FWA"), Fla. Stat. § 448.102 (Count III); failure to provide notice of the availability of continued benefits under COBRA (Count IV); and interference with Plaintiff's long-term disability insurance under ERISA, 29 U.S.C. § 1132 (a)(1)(b) (Count V). *See* ECF No. [51].

On April 25, 2017, Temenos filed its first Motion to Dismiss, ECF No. [51], seeking dismissal of Counts I, II, III, and V of the Amended Complaint. Thereafter, on May 11, 2017, the Court granted a motion to withdraw filed by Sanders' counsel, *see* ECF No. [57], and on June 13, 2017, Sanders advised the Court that he would proceed *pro se*, *see* ECF No. [62]. On August 4, 2017, the Court granted Temenos's first Motion to Dismiss. *See* ECF No. [84]. The Court dismissed Sanders' FMLA interference and retaliation claims without prejudice and with leave to amend, dismissed Sanders' FWA retaliation claim with prejudice on account of untimeliness, and dismissed Sanders' ERISA claim with prejudice on the basis that Temenos was not the proper defendant because it lacked "decisional control over [Sanders'] disability insurance plan." *Id.* at 6-9.

On August 14, 2017, Sanders filed a Second Amended Complaint, ECF No. [85], reasserting his claims under the FMLA (Counts I and II) and COBRA (Count IV), and also asserting for the first time claims for breach of employment contract (Count III) and breach of contract (Count V). Temenos moved to dismiss Counts III and V in a Partial Motion to Dismiss Second Amended Complaint filed on August 28, 2017, ECF No. [88], which the Court granted

by default on October 10, 2017, *see* ECF No. [103]. In the instant Motion, Temenos moves for summary judgment as to each of Sanders' remaining claims—that is, Counts I, II, and IV of the Second Amended Complaint. *See* ECF No. [90].

## II.    LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some

metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. But even where an opposing party neglects to submit any alleged material facts in controversy, a court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed. *See Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

## III. DISCUSSION

### A. Claims for FMLA Interference and Retaliation (Counts I and II)

The FMLA claims asserted in Sanders' Second Amended Complaint allege that Sanders "was terminated shortly after requesting FMLA leave in order to recover from [his] serious health conditions." *See* ECF No. [85] at ¶¶ 156 (Count I), 163 (Count II). The Second Amended Complaint does not, however, specify which exact communication between Sanders and Temenos constitutes the referenced request for FMLA leave. Sanders' Response to the Motion refers specifically to August of 2013, when Sanders "was requested to travel to Orlando even though [he] notified management that [he] had an issue with walking." ECF No. [105] at 7. In support of summary judgment as to Sanders' FMLA claims, Temenos essentially argues: (1) that

Sanders never gave any notice that he intended on taking FMLA leave; (2) that, in any event, McManus made the decision to terminate Sanders before certain communications that might purport to constitute such notice—namely, his email to McManus on August 25, 2013 regarding the medications he was taking and his telephone conversation with Human Resources on August 26, 2013—and so Sanders' termination had nothing to do with FMLA leave whatsoever; and (3) that Sanders cannot show that the reasons for his termination as offered by Temenos were pretextual. *See* ECF No. [90] at 9-14. The Court agrees with all three arguments.

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). "To preserve the availability of [family and medical leave] rights, and to enforce them, the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act[,] and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Shanks v. Potter*, 2010 WL 8347107, at *5 (S.D. Ga. Dec. 28, 2010), *aff'd*, 451 F. App'x 815 (11th Cir. 2011) (quoting *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206 (11th Cir. 2001)) (internal quotation marks omitted).

To prove a claim of FMLA interference, a plaintiff must demonstrate, by a preponderance of the evidence, the denial of an FMLA benefit to which he was entitled "and that []he 'has been prejudiced by the violation in some way.'" *Evans v. Books-A-Million*, 762 F.3d 1288, 1295 (11th Cir. 2014) (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). "To state a claim for retaliation under the FMLA, the employee must prove, by a preponderance of the evidence, that: (1) he is entitled to the claimed benefit, (2) he suffered an adverse employment action; and (3) the adverse action was "intentional" and "motivated" by his

participation in the protected activity, establishing a causal connection." *Bentley v. Orange Cnty., Fla.*, 445 F. App'x 306, 309 (11th Cir. 2011); *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). To establish a prima facie case of FMLA retaliation, "the plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she experienced an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *Gilliard v. Ga. Dep't of Corrs.*, 500 F. App'x 860, 864 (11th Cir. 2012). "If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action." *Id.* "If the defendant provides such a reason, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Id.* "Pretext means that the reason given by the employer was not the real reason for the adverse employment decision." *Id.* at 864-65. The plaintiff "must meet [the proffered] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Id.* (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)).

With respect to Temenos's first two arguments, the viability of Sanders' FMLA claims depends first on the threshold issue of notice. Specifically, "[t]he FMLA requires employees to provide 30 days advance notice of the leave, when the need to take leave is foreseeable." *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005) (citing 29 U.S.C. § 2612(e)(2)(B)). Alternatively, "where an employee's need for FMLA leave is unforeseeable, the employee need only provide her employer with notice sufficient to make the employer aware that her absence is due to a potentially FMLA-qualifying reason." *Id.* (quoting *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir. 1997)) (emphasis omitted). Whether foreseeable or not, "[a]n employee giving notice of the *need for FMLA leave* does not need to expressly assert rights

under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the *needed leave . . . .*" 29 C.F.R. § 825.301 (emphasis added).

Here, Sanders alleges in his Second Amended Complaint the following: "Plaintiff notified Defendant of [his FMLA health conditions] in writing, as Plaintiff knew them. These notices included diagnoses made by Plaintiffs [sic] medical care providers and current lists of Plaintiffs [sic] medications. Plaintiff was terminated shortly after *requesting FMLA leave* in order to recover from these serious health conditions." ECF No. [85] at ¶¶ 155-56, 162-63 (emphasis added). But nothing in the record supports the latter, conclusory allegation. To the contrary, it appears that Sanders never made a request for leave, nor did he communicate a "need for [] leave." 29 C.F.R. § 825.301. At most, Sanders' pertinent communications with Temenos—i.e., his email correspondence with Morales on August 20, 2013, his email correspondence with Morales and McManus on August 25, 2013, and his telephone conversation with Rivera on August 26, 2013—apprised Temenos of a "medical condition" that affected his walking and of the medications he was taking at the time. But even viewed in a light most favorable to Sanders, the Court does not view any of these communications as having placed Temenos on notice of Sanders' need for leave or that Sanders was planning on taking leave. In essence, Temenos was never provided with any notice for purposes of the FMLA, let alone sufficient notice. By extension, because no request for leave was ever expressed, there can be no requisite causal link between such a request and Sanders' termination. For these reasons alone, Temenos is entitled to summary judgment on Sanders' FMLA claims. *See, e.g.*, *Cruz*, 428 F.3d at 1381 (affirming summary judgment in favor of the defendant on the plaintiff's FMLA interference and retaliation claims where the plaintiff "failed to provide sufficient notice . . . that

she was requesting leave for a potentially FMLA-qualifying reason"); *Avila v. Childers*, 212 F. Supp. 3d 1182, 1192 (N.D. Fla. 2016) ("The Eleventh Circuit has held that '[i]f the evidence shows that a decision maker was unaware of an employee's request to take FMLA leave at the time of the decision to terminate the employee, the employer is entitled to summary judgment.'") (quoting *Rudy v. Walter Coke, Inc.*, 613 F. App'x 828, 830 (11th Cir. 2015)); *Rudy*, 613 F. App'x at 831 (affirming summary judgment for the defendant on the plaintiff's FMLA interference and retaliation claims where the plaintiff "did not present evidence suggesting a causal link between his termination and his request for medical leave").

In addition to the lack of both notice and any causal link, Sanders' FMLA retaliation claim must also fail because he cannot show that the reasons Temenos gave for his termination were pretextual. As a primary example, among the reasons Sanders was terminated, according to McManus, was that Sanders was expected in Orlando during the week of August 19, 2013, but did not show and could not be reached. *See* ECF No. [94-1]. Indeed, it was Sanders' absence that immediately preceded his termination days later. But Sanders has not, as he must, demonstrated that this legitimate, nondiscriminatory and non-retaliatory reason for his termination was a pretext for FMLA interference or retaliation. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997) (stating that a plaintiff must rebut "*each* of the employer's proffered reasons" to show pretext) (emphasis added).

At his deposition, Sanders claimed that his admitted absence from work in Orlando was not the true reason for his termination because, while he was absent, he did not receive any emails or texts from any Temenos employee—which, in his view, evinced that Temenos did not try to reach him. *See* ECF No. [92-1] at 237 ("Basically, there was nobody that tried to reach me. It would be one thing if you're trying to get hold of somebody, wouldn't you send out even

an e-mail? The only person who probably this was, was [McManus]. . . . That can easily be documented."). Of course, Sanders' claim that no one tried to reach out to him contradicts McManus' claim that "nobody could get a hold of [Sanders]." ECF No. [92-8]. Regardless, however, "[a] reason cannot be proved to be a 'pretext for discrimination ' unless it is shown both that the reason was false, *and that discrimination was the real reason*." *Gilliard*, 500 F. App'x at 865 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (emphasis added). With respect to the latter requirement, the Court finds it significant that at Sanders' deposition, Sanders did not testify or even suggest that FMLA leave had anything to do with his termination. Rather, when specifically asked why he believed he was terminated on August 28, 2013, Sanders responded in relevant part as follows:

> The project I was on was a death march. . . . One of the things I proposed was that in order to get a toe hold, into United States, that would buy a company that would match our needs, that we could convert clients into our software. . . .

> Well, someone else . . . went out and found a company that I can buy. That's the company they did buy. It turned out to be a train wreck, the company they bought. . . . It turned out to be an impossible job. . . . The project turned out to be extremely over budget, over time, and the person -- I got a rough idea of who that person was, but they needed somebody to say, oh, yea, this is the reason the project wasn't going on. . . .

> Eventually, I was good to go. Later on, you'll see in the thing with [Morales], where it became a very hostile environment. . . . [O]ne of the execs, Lynn Lindau, was the person behind it, becoming a hostile environment. She said people weren't doing their job, things weren't going right. . . .

ECF No. [92-1] at 49-51. When asked immediately thereafter if he thought he was "terminated for any other reason[,]" Sanders responded, "I can't think of any . . ." *Id.* at 52. Although the reason or reasons for Sanders' termination as articulated by Sanders at his deposition are not entirely clear to the Court, what is clear is that FMLA leave was not something that Sanders attributed his termination to.

With respect to both of Sanders' FMLA claims, Sanders failed to provide Temenos with sufficient notice of his need or request for FMLA leave—a threshold requirement. Additionally, with respect to Sanders' FMLA retaliation claim, Sanders cannot demonstrate a causal connection between any such need or request for FMLA leave and his termination, thereby falling short of establishing a prima facie case. Accordingly, Temenos is entitled to summary judgment on Counts I and II.

### B. Claim for COBRA Violation (Count IV)

The COBRA claim asserted in Sanders' Second Amended Complaint alleges that Temenos failed to provide Sanders with the required notice of availability of continued benefits—namely, his health insurance—pursuant to COBRA after his termination. *See* ECF No. [85] at ¶¶ 179-80. For relief, Sanders seeks compensation for the "significant distress and emotional distress" he claims to have suffered as a result, and any statutory damages available for the relevant period of the alleged violation. *Id.* at ¶ 181. Temenos appears to concede that no COBRA notification was sent to Sanders immediately following his termination. *See* ECF No. [90] at 15-18. Nevertheless, in support of summary judgment as to Sanders' COBRA claim, Temenos argues that irrespective of any COBRA violation, Sanders is not entitled to COBRA's statutory penalties because the free health insurance that Temenos provided him following his termination put him in a better position than he would have otherwise been in had no COBRA violation occurred. *See* ECF No. [90] at 15-18. As to Sanders' request for compensation for distress and emotional distress, Temenos argues that such relief is unavailable under COBRA. Both arguments are well taken.

Turning first to Sanders' request for compensation for distress and emotional distress, "COBRA does not provide for an emotional damages claim . . . ." *Gonzalez Villanueva v.*

*Warner Lambert*, 339 F. Supp. 2d 351, 360 (D.P.R. 2004) (collecting cases and observing that "courts have specifically denied awards for emotional distress for actions brought under the statute") (citing *Torres–Negrón v. Ramallo Bros. Printing, Inc.*, 203 F. Supp. 2d 120, 126 (D.P.R. 2002); *Corcoran v. United HealthCare, Inc.*, 965 F.2d 1321 (5th Cir.1992); *United Steelworkers of Am., AFL–CIO–CLC v. Connors Steel Co.*, 855 F.2d 1499 (11th Cir. 1988); *Powell v. Chesapeake & Potomac Tel. Co.*, 780 F.2d 419 (4th Cir. 1985); *DiSabatino v. DiSabatino Bros., Inc.*, 894 F. Supp. 810, 815-816 (D. Del. 1995); *Phillips v. Riverside, Inc.*, 796 F. Supp. 403, 411 (E.D. Ark. 1992)). Accordingly, for purposes of Count IV, COBRA's provision for statutory damages is the only avenue for relief that Sanders may pursue.

"COBRA permits employees to continue their health insurance coverage at the group rate after termination of employment." *Cole v. Trinity Health Corp.*, 2014 WL 222724, at *5 (N.D. Iowa Jan. 21, 2014) (citing 29 U.S.C. §§ 1161(a), 1163), *aff'd*, 774 F.3d 423 (8th Cir. 2014). When there is a termination of employment, COBRA provides for an 18-month period of coverage. 29 U.S.C. § 1163(2)(A)(i). "The plan may require payment of a premium for any period of continuation coverage" up to "102 percent of the applicable premium for such period . . . ." *Id.* § 1163(3)(A). "COBRA requires an administrator to give each participant a notice of certain health insurance coverage rights upon a 'qualifying event,' such as the termination of the participant's employment." *Cole*, 2014 WL 222724, at *5 (quoting 29 U.S.C. § 1166(a)). "ERISA, in turn, provides that a plan administrator who fails to meet the COBRA notice requirements 'may in *the court's discretion* be personally liable to such participant or beneficiary in the amount of up to $[110] a day from the date of such failure or refusal. . . .'" *Id.* (quoting 29 U .S.C. § 1132(c)(1)) (emphasis added). Especially pertinent here, "[i]n exercising its discretion

16

to impose statutory damages, a court primarily should consider the prejudice to the plaintiff and the nature of the plan administrator's conduct." *Id.* (internal quotation marks omitted).

The circumstances of this case are highly analogous to those in *Cole*. In *Cole*, the plaintiffs (a husband and wife) received "approximately eleven months of free health insurance coverage" from the defendant employer despite not having received from it a timely COBRA notice following the wife's termination. 2014 WL 222724, at *5. The plaintiffs then received health insurance through the husband's employer, leaving them "without coverage for only one month." *Id.* at *7. On the employer's motion for summary judgment, the court held that "imposing a civil penalty against [the defendant] would not serve the purposes of COBRA." *Id.* The court reasoned that (1) "because the [plaintiffs'] benefit of receiving extended free health care coverage far outweigh[ed] their claimed damages from the lack of COBRA notice, the [plaintiffs] [were] already in a better position than they would have been in but for the COBRA notice violation"; (2) the defendant "acted in good faith," given that "if [it] intended to act in bad faith, free health care coverage would not have been extended to the [plaintiffs]"; and (3) the plaintiffs "were not harmed or prejudiced" because they "were provided continued medical coverage for approximately eleven months after [the wife's] termination." *Id.* at *7-*8.

The Court finds that, as was the case in *Cole*, imposing a civil penalty against Temenos would not serve the purposes of COBRA. It is undisputed that Temenos provided Sanders with free health insurance for over ten months—ranging from the time of his termination to July 1, 2014. To begin with, the record evidence shows that had Sanders elected COBRA coverage, the total amount in premiums he would have paid over the relevant time period would have exceeded $20,000. As such, Sanders' claimed $4,000 in uncovered medical expenses since his termination is "far outweigh[ed]" by the benefit of having received free health care coverage—

that is, not having paid in excess of $20,000 in premiums over the same time period. *Id.* at \*7. It logically follows that Sanders suffered no real prejudice as a result of Temenos's COBRA violation. As the court in *Cole* explained, "[t]he purpose of the civil enforcement provisions of COBRA is, above all, to put plaintiffs in the same position they would have been in but for the violation." *Id.* (citing *Chenoweth v. Wal–Mart Stores, Inc.*, 159 F. Supp. 2d 1032, 1041 (S.D. Ohio 2001); *Burgess v. Adams Tool & Engineering, Inc.*, 908 F. Supp. 473, 478 (W.D. Mich. 1995); *DiSabatino v. DiSabatino Bros., Inc.*, 894 F .Supp. 810, 814 (D. Del. 1995); *Van Hoove v. Mid -America Bldg. Maintenance, Inc.*, 841 F. Supp. 1523, 1536 (D. Kan. 1993); *Phillips v. Riverside, Inc.*, 796 F. Supp. 403, 411 (E.D. Ark. 1992)). Imposing a civil penalty here would not fulfill that purpose. Moreover, like the employer in *Cole*, Temenos extended free health coverage to Sanders, which undercuts the notion that Temenos acted in bad faith. *See id.* Ultimately, the lack of prejudice to Sanders and the lack of bad faith on the part of Temenos weigh heavily against imposing a civil penalty under COBRA.

For these reasons, the Court declines to impose a civil penalty on Temenos for not providing Sanders notice of his COBRA rights. Accordingly, Temenos is entitled to summary judgment on Count IV.[5]

---

[5] As an additional basis for summary judgment, Temenos also correctly argues that each of Sanders' claims is precluded by judicial estoppel. *See* ECF No. [90] at 18-20. Specifically, Sanders filed a Chapter 13 voluntary petition for bankruptcy on January 29, 2014, and the case was closed on April 25, 2017. *See* Def. SOF at ¶¶ 60, 64. Although Sanders knew of the claims he now asserts in this case during the pendency of his bankruptcy case (his initial Complaint was filed on September 3, 2015, well before the bankruptcy case was closed), he did not disclose them in the bankruptcy case. *See generally De Leon v. Comcar Indus., Inc.*, 321 F.3d 1289, 1292 (11th Cir. 2003) (affirming summary judgment for the employer on discrimination and retaliation claims because the employee never disclosed the asserted claims as assets in his bankruptcy proceeding). Sanders did not, for example, amend his bankruptcy documents after the commencement of this lawsuit in order to add the instant claims. *See id.* (applying judicial estoppel because "despite [the plaintiff's] continuing duty to disclose all assets or potential assets to the bankruptcy court, he did not amend his bankruptcy documents to add a potential employment discrimination claim until after [the defendant] relied on it in its motion to dismiss the case"); *Kunstmann v. Aaron Rents, Inc.*, 2014 WL 1388387, at \*6 (N.D. Ala. Apr. 9, 2014) ("[U]nder the established law of this circuit, a Chapter 13 debtor has a statutory duty to disclose changes in assets."). Although Sanders

## IV.    CONCLUSION

For all of the reasons stated herein, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment, **ECF No. [90]**, is **GRANTED**.  Final Judgment will be entered by separate order.  To the extent not otherwise disposed of, all pending motions are **DENIED** as moot.[6]  All pending hearings are **CANCELLED**.  The Clerk is instructed to **CLOSE** the case.

**DONE AND ORDERED** in Miami, Florida this 13th day of October, 2017.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

Ralph L. Sanders
561 SW 60th Ave
Plantation, FL 33317
PRO SE

---

also filed a second bankruptcy case under Chapter 13 on July 20, 2017, wherein he did disclose the instant claims, there were several creditors in Sanders' first bankruptcy case that were not listed as creditors in the second case.  *See* Def. SOF at ¶¶ 66-67.

[6] This includes Sanders' Motion for Postponement, ECF No. [106], filed on October 10, 2017.  The Motion for Postponement requests a "postponement of the upcoming trial[,]" inexplicably referencing the Americans with Disabilities Act and Sanders' "need[] to perform administrative remedies."  *Id.* at 3-4. To be sure, Sanders' Second Amended Complaint does not assert any claims under the Americans with Disabilities Act.